IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JEVELL WILLIAMS,

                Plaintiff,                            OPINION AND ORDER

    v.

                                                  17-cv-794-wmc

GARY BOUGHTON and DAVID EWING,

                Defendants.

---

*Pro se* plaintiff Jevell Williams, an inmate previously incarcerated at the Wisconsin Secure Program Facility ("WSPF"), alleges that defendants Gary Boughton, WSPF's warden, and David Ewing, WSPF's then chaplain, denied him permission to marry in violation of his Fourteenth Amendment rights. Before the court is defendants' motion for summary judgment. (Dkt. #18.) For the reasons that follow, the court will grant that motion.

UNDISPUTED FACTS[1]

A. Overview of the Parties

Although Williams is currently incarcerated at Stanley Correctional Institution, he was incarcerated at WSPF at all times relevant to this case. Defendant Gary Boughton has been the Warden at WSPF since March 23, 2014. Defendant David Ewing is the former Chaplain at WSPF, holding that position from October 2013 through June 2018.

---

[1] Unless otherwise noted, the following facts, viewed in the light most favorable to plaintiff as to the non-moving party, are material and undisputed.

### B. Williams' Involvement with Ali Rass

In 2007, Williams first met Ali Rass, which he represents involved an "intimate relationship." (Pl.'s Resp. to Defs.' PFOFs (dkt. #28) ¶ 4 (citing Williams Decl. (dkt. #29) ¶ 5).) Defendants dispute whether Williams and Rass were involved in a "relationship" in 2007, directing the court to statements made by Williams some eight years later in 2015 to Prison Rape Elimination Act ("PREA") investigators to the effect that he "did not consider it a relationship." There is no dispute that they had sexual encounters during this earlier period before his incarceration in 2008. (Defs.' Reply to Pl.'s PFOFs (dkt. #31) ¶ 4 (citing Weber Decl., Ex. 1000 (dkt. #21-1) 8).)

Before his incarceration at WSPF, Williams spent time at Dodge Correctional Institution ("DCI"). For approximately six months, from July 2014 until January 2015, Ali Rass was also employed by the Wisconsin Department of Corrections ("DOC") as a contract Certified Nursing Assistant at the DCI Infirmary, where for some of this period, Williams was an inmate worker.

Rass resigned from her position at DCI in January 2015, and shortly after this, she was approved to visit Williams. Her first (and last visit) with Williams at DCI was on March 2, 2015, after she had resigned. Defendants acknowledge that this visit was a mistake and violated DAI Policy 309.06.01, which provides that any request to visit a correctional facility by a "[f]ormer DOC employee within the past 12 months" requires "further investigation and/or denial of the proposed visitor," and should not have been allowed by the institution. (Defs.' PFOFs (dkt. #20) ¶ 7 (citing Boughton Decl., Ex. 1004 (dkt. #22-4) 7).) Soon after the visit, DCI suspended Rass's visiting privileges for thirty

days, and then for 11 additional months because Rass had been a contract agent within the past 12 months, citing Wis. Stat. § 309.08(4). (Boughton Decl., Ex. 1005 (dkt. #22-5).) In addition, DCI initiated a PREA investigation to determine what led to the relationship between Williams and Rass, and whether there had been other misconduct within DCI. As part of that investigation, Williams' property was searched and numerous letters and photos of Rass and her children were found.

The PREA investigation was completed on July 1, 2015, with the investigators recommended that the allegation of sexual misconduct "be substantiated" regarding four inmates, including Williams. Among other things, the PREA investigation report describes letters from Rass to Williams in which she refers to him as "Hubby" and describes "miss[ing] your touch and your kisses." (Defs.' PFOFs (dkt. #20) ¶¶ 15-17.)[2] However, during multiple interviews during the PREA investigation, Williams denied any type of physical activity during Rass's employment at DCI, although he acknowledged prior sexual encounters as previously noted. For her part, Rass told investigations that she knew

---

[2] Plaintiff objects to the admissibility of these statements on the basis that he had requested and defendants denied knowledge of "[a]ll letters, i.e. U.S. Mail, Photos, and other property seized from plaintiff by the DOC, and the Dodge County Sheriff's department between the dates of March 2015 and June 2015." (Pl.'s Resp. to Defs.' PFOFs (dkt. #28) ¶ 16.) While defendants' choice of wording in responding to the discovery request is certainly confusing given that defendants relied on the PREA investigation report in quoting language from the letters, and defendants produced the report in discovery. Still, there is no dispute that defendants Boughton and Ewing had no role in confiscating or maintaining the letters themselves, nor that they had any additional knowledge or possession of the letters or other of defendant's property seized by the DOC. Moreover, to the extent plaintiff is challenging these statements on hearsay grounds, the report likely falls within the business record exception under Federal Rule of Evidence 803(6) and statements attributed to defendant are admissible as coming from (or adopted by) a party opponent under Rule 801(d)(2). Finally, even if the language quoted from the letters were not admissible for the truth of the matter, the language in the report is still properly considered for the impact it had on defendants' state of mind and subsequent actions.

Williams before his incarceration, but did not make contact with him, nor any other inmates, until after she left DOC's employment in January of 2015. Despite Rass's denial of wrongdoing, the investigators found the allegations of sexual misconduct with Williams and three other inmates were substantiated. The matter was then referred to the Dodge County Sheriff's Department to be reviewed for possible criminal charges.

### C. Williams' Transfer to WSPF and Rass's Attempts to Visit

On June 24, 2015, Williams was transferred from DCI to WSPF, where visit requests are reviewed by the Warden (or the Warden's designee) consistent with DOC policy for each individual institution. Even though Rass's visiting privileges at DCI were suspended for one year, Williams' transfer to WSPF meant that she could at least submit a new request to visit Williams. In July 2015, Rass did just that, which not surprisingly WSPF's Records Custodian, Diane Alderson, denied on July 6, 2015, citing Wis. Admin. Code § DOC 309.08(4)d. Undaunted, on July 9, Rass then appealed that denial to Warden Boughton.

Meanwhile, on July 17, 2015, John Paquin, the Assistant Administrator of the DOC Department of Adult Institutions ("DAI"), sent a letter to Rass, informing her that her visiting privileges had been permanently revoked at all DOC institutions, effective immediately, "[a]s a result of [her] being a former contract agent and engaging in illegal activity while employed at Dodge Correctional Institution and with deliberate disregard for Department policy and procedures." (Defs.' PFOFs (dkt. #20) ¶ 41 (citing Boughton Decl., Ex. 1006 (dkt. #22-6).) Receipt of this letter apparently prompted Rass to submit a second appeal to Warden Boughton on July 23. After viewing Paquin's decision and

4

contacting DCI, however, Boughton responded to Rass on July 28, 2015, informing her that he would take no further action in light of the DOC's decision to revoke her visiting privileges for all DAI facilities.

### D. Marriage Approval Criteria and Williams' Marriage Requests

About six months later, on or around January 25, 2016, Williams submitted a DOC-1671 Request for Marriage, seeking to marry Rass pursuant to DAI Policy 309.00.06. As set forth in that policy, inmates wishing to marry while incarcerated must gain advance approval from the DOC:

> Inmates may request to marry while incarcerated if the following conditions are met:
>
> A. The marriage does not pose a threat to the security of the facility or a threat to the safety of the public, or threatens other legitimate penological interest[.]
>
> B. There are no legal impediments to marriage[.]
>
> C. The inmate is not scheduled for release within nine months.
>
> D. The propose spouse or proposed spouse's children are not victims of the inmate.
>
> E. The proposed spouse has never been convicted in any criminal activity with the inmate.
>
> F. The proposed spouse has been on the inmate's visiting list for a minimum of one year or is able to demonstrate a longstanding relationship with the proposed spouse.
>
> G. Marriage between two inmates confined in DOC facilities shall be prohibited.
>
> H. Inmate marriage ceremony shall be performed on site in the facility where the inmate is incarcerated. DAI shall not arrange for inmates to be transported for marriage ceremonies.

DAI Policy 309.00.06 (Boughton Decl., Ex. 1002 (dkt. #22-2) 2).

Plaintiff does not dispute that this is the policy, nor that at WSPF in 2016, defendant Ewing was the marriage coordinator for inmates, responsible for receiving requests and conducting a preliminary review.[3] Generally, after Ewing received a marriage request, he would check to make sure an inmate's prospective spouse had been on the inmate's visitor list for at least one year. He would also verify that the inmate had enough time left on their sentence to complete the inmate marriage requirements. Ewing would then make a recommendation to the Warden on the appropriateness or legality of the request, forwarding all of the pertinent information to the Warden for his review. If a marriage request was approved, it was then Ewing's responsibility to schedule and oversee counseling sessions between and inmate and his intended spouse.[4] If counseling was successfully completed, then Ewing would schedule the marriage ceremony.

Ewing no longer remembers Williams' marriage request specifically, but he avers that upon receipt, he would have followed DAI Policy and his practice to make sure that "an inmate's prospective spouse had been on the inmate's visitor list for at least one year." (Ewing Decl. (dkt. #25) ¶ 8.) At that time, therefore, Ewing assumes that he learned that

---

[3] Instead, plaintiff argues that the Warden has an obligation to modify and update policies to ensure that they comply with judicial rulings, directing the court to the Seventh Circuit's decision in *Riker v. Lemmon*, 798 F.3d 546 (7th Cir. 2015), holding that "a prison's visitation policy, on its own, does not justify prohibiting an inmate's marriage." *Id.* at 557. (*See* Pl.'s Resp. to Defs.' PFOFs (dkt. #32) 16.) The court will address this legal argument in the opinion below.

[4] Per DAI Policy 309.00.06, an inmate and his intended spouse must complete "premarital counseling." If an inmate is within three years of release and provides documentation that he knew his intended spouse prior to incarceration, then the couple must complete six counseling sessions. Otherwise, the couple must complete twelve counseling sessions. All counseling sessions must be a minimum of two hours and are conducted by facility-approved clergy or counselors from the community.

Rass has been denied visitation privileges, which is consistent with the contemporaneous form, reflecting that either he or his designee checked "No" for "all legal and policy conditions have been met." That form was signed and dated January 26, 2016. To the best of Ewing's recollection, this is the only involvement he had in Williams' marriage request.

This form was then sent to Warden Boughton for his review. The warden denied this first request in a letter to Williams, dated January 26, 2016, explaining:

> DAI Policy 309.00.06, Inmate Marriages, outlines the requirements for marriages in a correctional setting. One of those requirements is, "the proposed spouse has been on the inmate's visiting list for a minimum of one year or is able to demonstrate a longstanding relationship with the proposed spouse." A decision was made on July 17, 2016 by Division of Adult Institutions Security Chief Mark Weisgerber to permanently revoke Ms. Rass's visiting privileges for ALL DAI facilities. Given that Ms. Rass is not allowed entrance into the facility, I am denying your request. Should circumstances change in the future, you may resubmit your request.

(Boughton Decl., Ex. 1003 (dkt. #22-3).)

Williams avers that he filed another request for marriage on August 29, 2016, although defendant Boughton has been unable to find any record of this second request. Williams furthers represents that he attached to the form "additional information regarding [t]he longstanding relationship between [me] and the intended spouse, Ali Rass, on a sheet of paper attached to it." (Williams' Decl. (dkt. #29) ¶ 6.)[5] There is no dispute, however, that on September 2, 2016, Williams sent Warden Boughton a letter that

---

[5] In his response to defendants' proposed findings of facts, plaintiff also directs the court to "attached documents marked Ex. 3," but there were no attachments to his response or to his supporting declaration. (Pl.'s Resp. to Defs.' PFOFs (dkt. #28) ¶ 62.)

7

references his August 29 request and indicates that it had been returned to him by Chaplain Ewing.  The letter further states that the August 29 request form included the following information:

> I met Ali Rass in 2007.  The first few months of our knowing each other was via social media.  Eventually we began to hang out together, and party, etc.  I introduced her to my family and friends, who accepted her w/ open arms.  In 2008, when I was arrested, I lost contact w/ her, along w/ a lot of other family and friends.
>
> None-the-less, our relationship w/ each other has always maintained a significant degree of integrity, and now we are willing to take that next step.

(Boughton Decl., Ex. 1010 (dkt. #22-10) 2.)

Warden Boughton responded formally to this September 2, 2016, letter as follows:

> Per DAI Policy 309.00.06, Inmates Marriages, Ms. Rass is neither on your visiting list, as her visiting privileges have been revoked from all DAI facilities, nor do I believe the definition of a longstanding relationship has been met.  My decision to deny your request for marriage stands.

(*Id.* at 1.)  In his declaration, Boughton also explains that at the time Williams submitted his request to marry Rass in January 2016, he was aware of Rass's permanent visitation ban and the substantiated PREA investigation report, specifically directing the court to an October 28, 2015, email from DAI Administrator James Schwochert, which contained a summary of Rass's visitation history in DOC's facilities and attached the PREA summary. (Boughton Decl., Ex. 1009 (dkt. #22-9).)

Moreover, employees, including contract agents, are prohibited by Executive Directive #16, "Fraternization Policy," from engaging in sexual conduct or having a relationship of any inmate.  Defendants explain the rationale behind the policy as

8

"eliminat[ing] any potential conflict of interest or impairment of the supervision and rehabilitation provided to adult and juvenile offenders by Corrections." (Defs.' PFOFs (dkt. #20) ¶ 67.) Defendants also contend that this policy protects inmates "at risk of being manipulated or abused if professional boundaries are not established and adhere to," and also protects against manipulation on the part of inmates. (*Id.* ¶¶ 68-69.) Finally, defendants point out that it is illegal under both federal and state law to have sexual contact with an inmate.

Based on all of this, defendant Boughton concludes by averring that "Rass showed she had a willingness to violate strict rules against fraternization, engaging in criminal activity with at least four inmates during her six months at DCI. Allowing a person who has shown such disregard for rules to marry an inmate, one of her victims, threatens prison security and undermines inmate rehabilitation." (Boughton Decl. (dkt. #22) ¶ 27.)

E.  **Williams' Transfer to Stanley and Subsequent Visits with Rass**

Williams was eventually transferred to Stanley Correctional Institution on December 2, 2017. Despite the permanent ban on her visiting DAI facilities, Rass continued to try to visit Williams, and Williams also submitted an inmate complaint after one such effort was denied. While that complaint was dismissed, it triggered a review by the DAI Administrator of Rass's permanent visit ban.

In March 2019, the DAI Administrator opted to rescind the permanent ban. Rass's visitation rights were not immediately reinstated, but she was allowed to reapply for visitation privileges and advised that any application would be considered by the facility. After that, Rass's May 20, 2019, application to visit Williams at Stanley was approved on

June 6, 2019. From June 6, 2019 through the date of defendants' filing of summary judgment, Rass had visited Williams 16 times.

OPINION

Plaintiff was granted leave to proceed on a Fourteenth Amendment claim against defendants Boughton and Ewing for denying his marriage application recognizing "[t]he Constitution protects a prisoner's fundamental right to marry; individuals do not lose this constitutional protection simply because they are imprisoned." *Riker v. Lemmon*, 798 F.3d 546, 551 (7th Cir. 2015) (citing *Turner v. Safley*, 482 U.S. 78, 84 (1987); *Obergefell v. Hodges*, --- U.S. ---, 135 S. Ct. 2584 (2015)). Still, as defendants emphasize at summary judgment, this constitutional protection "is subject to substantial restrictions as a result of incarceration." *Id.* (quoting *Turner*, 482 U.S. at 95). In particular, "a prison regulation [that] impinges on inmates' constitutional rights . . . is valid if it is reasonably related to legitimate penological interests." *Id.* (quoting *Turner*, 482 U.S. at 89).

In assessing the reasonableness of a restriction under the familiar *Turner* standard, the court considers the following four factors:

> (1) whether a valid, rational connection exists between the regulation and a legitimate government interest behind the rule; (2) whether there are alternative means of exercising the right in question; (3) what impact accommodation of the asserted constitutional right would have on guards, other inmates, and on the allocation of prison resources; and (4) what easy alternatives exist to the regulation because, although the regulation need not satisfy a least restrictive alternatives test, the existence of obvious alternatives may be evidence that the regulation is not reasonable.

*Riker*, 798 F.3d at 552 (quoting *Shimer v. Washington*, 100 F.3d 506, 509 (7th Cir. 1996),

and citing *Turner*, 482 U.S. at 89–90).

While courts must give "substantial deference to the professional judgment of prison administrators," *Van den Bosch v. Raemisch*, 658 F.3d 778, 786 (7th Cir. 2011) (internal citation omitted), defendants cannot "avoid court scrutiny by reflexive, rote assertions," *Riker*, 798 F.3d at 553 (citation omitted).  Said another way, while "the burden of persuasion is on the prisoner to disprove the validity of a regulation," defendants must "still articulate their legitimate governmental interest in the regulation and provide some evidence supporting their concern." *Id.* (citation and internal quotation marks omitted).

As an initial matter, plaintiff should understand that this case is *not* concerned with whether defendants complied with or violated the policy.  *See Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003) ("42 U.S.C. § 1983 protects plaintiffs from constitutional violations, not violations of state law or, in this case, departmental regulations and police practices.").  Nor is the court limited to considering only the defendants' reliance on the requirement for visitations of at least one year between an inmate and proposed spouse as required by DAI Policy 309.00.06.   Instead, plaintiff must disprove the validity of any regulation, policy or reason articulated by defendants for denying his marriage request. *Riker*, 798 F.3d at 552-53.

Said another way, this court must consider whether a reasonable jury could conclude that the denial of Williams' requests to marry Rass was unrelated to legitimate penological interests articulated by defendants.  As reflected in the undisputed facts above, at the time of the original denial of plaintiff's request to be married, defendants did principally rely on the fact that Rass was not on the visitor list for a minimum of one year.  As Williams points

out in his response to defendants' motion for summary judgment, and as this court identified in the screening order, if the *only* reason for defendants' marriage denial were Rass not being on the visitation list, then at least arguably under the Seventh Circuit's holding in *Riker*, this restriction may not be reasonably related to a legitimate penological interest, or at least a reasonable jury could so find. *See Riker*, 798 F.3d at 556-57 (a prison's visitation policy, on its own, does not justify prohibiting an inmate's marriage) (citing *Martin v. Snyder*, 329 F.3d 919, 922 (7th Cir. 2003) (noting that "[r]estrictions on visitation[ are] not enough to justify prohibiting marriage")).[6]

However, there are other reasons for denying plaintiff's marriage request that defendants articulated at the time of the denial and at summary judgment. In particular, Boughton's January 2016 response to Williams' first request to marry Rass also indicated that Williams lacked evidence of a longstanding relationship, effectively punting the request back to Williams for additional information. In response, some eight months later, Williams supplemented his request. While Boughton still denied his application, again noting the visitation ban, he also found once again that plaintiff failed to provide support of his longstanding relationship with Rass. Indeed, Williams himself has been all over the map as to the nature of their relationship before he was incarcerated. Still, perhaps, factual disputes remain as to whether Williams' evidence -- that he and Rass were engaged in a short-term relationship in 2007 even before his incarceration in 2008 -- satisfies the

---

[6] Defendants attempt to distinguish *Riker*, or otherwise explain why consideration of the visitation policy in reviewing a request to marry is reasonable. Specifically, defendants argue that the visitation policy provides a check on whether prospective spouse would also meet some of the requirements for marriage approval and is important for purposes of satisfying counseling requirements. However, the court need not resolve this question in light of its finding that there are other reasons for the denial that are reasonably related to legitimate penological interests.

"longstanding relationship" requirement under the policy or, perhaps more critically, whether a policy requiring such proof is reasonably related to a legitimate penological interest sufficient to deny a marriage request. Similarly, Williams' claim may call into question whether, in the absence of a record of visits, requiring a longstanding relationship with a prospective spouse furthers a legitimate penological interest. However, the court need not resolve this arguable factual dispute either given the focus of defendants' motion.

Rather, in seeking summary judgment, defendants primarily rely on another basis -- the substantiated PREA report after an investigation into Rass's conduct while working as a contract agent at Dodge Correctional Institution. To be fair, this reason is perhaps implicit in defendants' originally stated reasons for denying Williams' application by reference to Rass having been banned from visits to all DAI facilities. In determining whether the *Turner* standard is satisfied, however, the court may consider *any* reason; it need not be the *actual* reason provided at the time of the denial. *See Hammer v. Ashcroft*, 570 F.3d 798, 803 (7th Cir. 2009) ("The Supreme Court did not search for 'pretext' in *Turner*; it asked instead whether a rule is rationally related to a legitimate goal. That's an objective inquiry.").

Here, the court agrees with defendants that a reasonable jury could not find that the denial of Williams' application for marriage was not reasonably related to legitimate penological interests. As the Seventh Circuit explained in *Nigl v. Litscher*, 840 F.3d 329 (7th Cir. 2019), cert. denied, No. 19-7899, 2020 WL 2515703 (U.S. May 18, 2020), another prison marriage case following *Riker*, denying a prisoner's request to marry based on evidence of serious misconduct between the prisoner and a former prison psychologist

13

is "reasonably related to [the prison's] legitimate penological interest in preserving the security of the prison, inducing compliance with and promoting respect for the prison's rules governing inmate contacts and rehabilitating [the prisoner]." *Id*. at 334. The Department having found that Rass engaged in inappropriate, sexual conduct with inmates, including Williams, while engaged as a contract agent at DCI, a reasonable trier of fact is compelled to find that allowing Williams and her to marry would, at minimum, undermine the original consequences for both Rass's and Williams's violations of prison policy. *See id.*; *see also Martin v. Snyder*, 329 F.3d 919, 922 (7th Cir. 2003) ("Restrictions on visitation, though not enough to justify prohibiting marriage, may well justify deferment, so that the sanction for misconduct will have some sting."). Moreover, denying the request also protects Williams in case Rass exploited or otherwise victimized him in her position as a nurse vis-à-vis his position as an inmate infirmary employee. *See Nigl*, 940 F.3d at 335.

Finally, the court notes that despite what had originally been an indefinite ban on Rass's visitation rights, she is currently able to visit Williams and has been doing so on what appears to be a frequent basis, meaning that the decisionmakers at Stanley Correctional Institution may eventually reach a different decision in response to a request to marry. Regardless, the denial of plaintiff's marriage applications in 2016 was not a permanent denial, but made, "in part, because of temporal proximity between the rule-breaking and the request." *Nigl*, 940 F.3d at 336. This fact also cuts against finding a violation of plaintiff's Fourteenth Amendments rights under the *Turner* factors. *Nigl*, 940 F.3d at 336 (noting the plaintiff's ability to submit a new marriage request at plaintiff's

new place of incarceration); *Martin*, 329 F.3d at 922 ("*Turner* does not say that every delay violates the Constitution.").

Accordingly, the court agrees with defendants that the undisputed facts here are much more like the facts in *Nigl*, where defendants offered legitimate reasons for the marriage denial, than it is like those in *Riker*, where the decision was "premised entirely on its ex-employee visitation policy and the security justifications that support that policy." *Id.* (quoting *Riker*, 798 F.3d at 556 & n.28).  The court, therefore, will grant defendants' motion for summary judgment and direct entry of judgment in their favor.[7]

## ORDER

IT IS ORDERED that:

1) Defendants Gary Boughton and David Ewing's motion for summary judgment (dkt. #18) is GRANTED.

2) The clerk's office is directed to enter judgment in defendants' favor.

Entered this 12th day of June, 2020.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

---

[7] In light of the court's finding that defendants' denial of Williams' applications for marriage did not violate his Fourteenth Amendment rights, the court need not address defendants' alternate grounds for summary judgment on qualified immunity grounds, other than to note that it was *not* clearly established in 2016 that prison officials were prevented from considering a substantiated PREA investigation report of sexual misconduct and serious violations of prison policy by an inmate and a former employee in denying that inmate's request to marry.  As such, qualified immunity provides an additional basis for summary judgment, especially in light of Williams' transfer to Stanley Correctional Institution, limiting any relief to monetary damages.